United States District Court
Northern District of California

1

2

3

4

5

6

7

8            UNITED STATES DISTRICT COURT

9            NORTHERN DISTRICT OF CALIFORNIA

10                San Francisco Division

11 | C.E.W. , a minor, individually and as
   | successor-in-interest for Decedent          Case No.  13-cv-04516-LB
12 | MOHAMMED SHAH, et al.,
   |                                              **ORDER DENYING SUMMARY**
13 |              Plaintiffs,                     **JUDGMENT**

14 |       v.                                     [Re: ECF No. 53]

15 | CITY OF HAYWARD, et al.,

16 |              Defendants.

17                    **INTRODUCTION**

18        The plaintiffs' decedent, Mr. Mohammed Shah, died after defendant Allen Neula, a City of

19 Hayward police officer, shot him multiple times while trying to arrest him. Officer Neula had

20 come across Mr. Shah while the latter was sitting in a reportedly stolen car. From the central

21 allegation that Officer Neula used excessive force in shooting Mr. Shah, the plaintiffs bring five

22 claims: (1) 42 U.S.C. § 1983 and Fourth Amendment; (2) 42 U.S.C. § 1983 and Fourteenth

23 Amendment – Substantive Due Process; (3) also 42 U.S.C. § 1983 and Fourth Amendment; (4)

24 Wrongful death by negligence – Cal. Code Civ. Pro. §§ 377.60-.61; and (5) Bane Act – Cal. Civ.

25 Code § 52.1. (3d Am. Compl. – ECF No. 40.) [1] The first third and claims are substantively

26

27

28 _____

[1] Record citations are to material in the Electronic Case File ("ECF"); pinpoint cites are to the
ECF-generated page numbers at the tops of documents.

ORDER (13-cv-04516-LB)

1    identical in that they both allege excessive force in violation of the Fourth Amendment; they differ

2    only in that the first is by C.E.W. for Mr. Shah's alleged wrongful death, and the third is a survival

3    action by C.E.W. as successor in interest to Mr. Shah. The defendants move for summary

4    judgment on all the plaintiffs' claims. [2] The court held a hearing on April 16, 2015. For the reasons

5    given below, the court holds that disputed issues of material fact prevent it from deciding this case

6    as a matter of law, and so denies the defendants' summary-judgment motion.

**FACTS**

**I. THE DEFENDANTS' VERSION**

Defendant Allen Neula is a police officer for the City of Hayward. (Neula Dep. – ECF No. 57-2, attached as Exhibit A to the Declaration of Rafael E. Alvarado Jr., pg. 11:24-12:23.) In addition to his normal duties, Officer Neula serves as a "defensive tactics arrest and control instructor," a "field training officer" and a "Taser instructor," teaching arrest and control tactics to employees of the Hayward Police Department ("HPD"). (Neula Deposition, pg. 14:23 – 15:23.) He has received over 250 hours of training to become a California POST-certified[3] instructor on behalf of the HPD. (Neula Decl. – ECF No. 53-2, ¶ 2.)

On the day of the shooting, Officer Neula was working the day shift. (Neula Dep. 20:9-23.) He was wearing a police uniform with sewn-on HPD patches on both arms. (Neula Dep. 52:3-12.) At approximately 11:00 a.m., Officer Neula was driving an HPD patrol car equipped with lights and sirens and patrolling the area of South Hayward. (Neula Dep. 55:14-19, 56:20-57:13.) He noticed that a call for service — a speeding vehicle — had activated on his patrol car's mobile computer monitor. (Neula Dep. 58:19 – 59:6.) He responded to the call and proceeded to investigate. (*Id.*) While searching for the speeding vehicle, Officer Neula noticed a late-model Honda parked on Vanderbilt Street across from Fairway Greens Park. (*See* Neula Dep. 61-62.) From his training and experience, Officer Neula knew that Hondas are commonly stolen vehicles; consequently, during

---

[2] In their opposition, the plaintiffs "submitted" on the defendants' challenge to their fourth claim brought under *Monell v. New York City Dept. of Social Servs.*, 436 U.S. 658, 690-01 (1978). They confirmed at the hearing that they no longer pursue that claim.

[3] POST stands for Peace Officer Standards and Training. These are the local standards for peace-officer training.

United States District Court
Northern District of California

his shifts, he randomly runs the license plates of late-model Hondas. (Neula Dep. 61-62.)  As he approached the Honda from the rear, Officer Neula entered the license-plate number into his mobile computer to check if the car had been reported stolen. (*Id.* at 62-63.) He also observed a person seated in the Honda's driver's seat. (*Id.* at 64-65.) The occupant appeared to Officer Neula to be doing something to the center console of the vehicle with his hands. (*Id.*)

As he passed the Honda, Officer Neula observed the occupant, who was later identified as Mohammed Shah (the plaintiff's decedent). (Neula Dep. 66:24 – 67:5.) The Honda's driver's-side window was approximately halfway down. (Neula Dep. 66:3-9.) Officer Neula claims that Mr. Shah had a "wide-eyed look," that his "eyes were bugged out" and that he "looked like he might be a crankster." (Neula Dep. 67:6-19.) Mr. Shah appeared to be concentrating on the center-console area of the Honda. (Neula Dep. 68:1-9.) He did not appear to see Officer Neula's police car as it continued past him. (*Id.*)

When he had driven about one-half block farther, Officer Neula's computer screen started flashing, indicating that the Honda was stolen. Officer Neula radioed HPD dispatch and reported that he had located an occupied stolen vehicle and provided the car's location and license-plate number. (Neula Dep. 63-64, 70.) The dispatcher sent cover units to Officer Neula's location. (Neula Dep. 70:18 – 71:1.)

Three other HPD officers who were working that day — Sergeant Antonio Puente, Sergeant Phil Divanagracia, and Sergeant Robert Farro — each heard Officer Neula radio that he had found an occupied stolen vehicle. (Puente Dep. – ECF No. at 24-25; Divanagracia Dep. – ECF No. 54-11 at 10, 17; Farro Decl. – ECF No. 53-3 ¶¶ 2-3.)

Meanwhile, Officer Neula made a U-turn and started back toward the Honda. (Neula Dep. 71.) He noticed as he approached that Mr. Shah still appeared to be focused on the car's center console. (*Id.* at 72-73.) Officer Neula pulled up in front of the Honda so that his police car faced the Honda in a slightly offset position. (*Id.* at 73-74.) He explains that he positioned his car in front of the Honda to maintain continuous visual contact with Mr. Shah to prevent him from fleeing on foot or driving off. (*Id.* at 77-78.) He "chirped" his siren to signal his presence and activated his vehicle's lights. (*Id.* at 74-75.) Officer Neula then got out of his car and began to issue commands. (*Id.*) Mr.

Shah now looked toward Officer Neula. (*Id.* at 75-76.) Officer Neula stood in the "V" of his patrol car, which is the area between the car's open door and its frame. (*Id.* at 82.) Officer Neula ordered Mr. Shah to "Get your hands up" and also said, "Hayward Police, get your hands up, keep your hands where I can see them." (*Id.* at 82.) He states that he yelled these commands multiple times. (*Id.*)

A witness who lives across the street from where all this happened, Liliana Vancea, testified that she had first seen Mr. Shah in the Honda a couple of hours earlier, when she took out the garbage. (Vancea Dep. – ECF No. 54-12 at 6, 8.) He was awake but, to Mrs. Vancea's perception, was trying to hide by slumping in the seat when people walked by. (*Id.* at 10-11, 55-56.) She relates, "There was something frightening in his look." (*Id.*)

When Officer Neula arrived on the scene, Mrs. Vancea was in her kitchen. (*Id.* at 17.) The front door of her home was open, with only a metal security gate covering the entrance. (*Id.*) She heard a voice saying, "Put your hands up. Step out of the car." (*Id.* at 17, 20.) She walked over to her living-room window, which looks out on the street. (Vancea Deposition, pg. 22:4-8.) She estimates that she heard Officer Neula give these commands approximately five to seven times. (*Id.* at 20.)

A second witness, Gracie Nelson, was in the park at the time. Ms. Nelson was watching three children, her "daycare kids." (Nelson Recording – ECF No. 53-4 at 2:30-2:45 (lodged as a hard exhibit).) Ms. Nelson, too, heard Officer Neula repeatedly order Mr. Shah to put his hands up and get out of the car. (*Id.* at: 6:00-6:15; 7:00-7:30; 9:30-11:30; 12:15-13:15.)

According to Officer Neula, Mr. Shah initially lifted his hands up about chest high. (Neula Dep. 84.) Ms. Nelson also observed Mr. Shah initially put his hands up. (Nelson Recording at 6:00-7:00.) But — again, according to Officer Neula — Mr. Shah then began to disobey orders: he dropped his hands down toward the Honda's center console and right-passenger-seat area. (Neula Dep. 88-90.) At this point, Mr. Shah's hands were out of Officer Neula's view. (*Id.* at 91.) Officer Neula testified that Mr. Shah was not obeying his orders to keep his hands where the officer could see them. (*Id.* at 76.) Mr. Shah glanced toward the passenger-seat area and then back to Officer Neula; he raised his hands but then dropped them out of view and did this (says the officer) about

1    three or four times. (*Id.* at 92.)

2        When Mr. Shah's hands came back into view, Officer Neula decided to approach the Honda.

3    (*Id.* at 93.) He now left his patrol car with his gun unholstered. (*Id.*) The Honda's driver's-side

4    window was still about halfway down. (*Id.* at 110.) Officer Neula approached to see what Mr.

5    Shah was reaching for and thought he could try to reason with him. (*Id.* at 97.) He was concerned

6    that Mr. Shah could be armed. (*Id.* at 103.) He describes the Honda's interior as cluttered, which

7    made it hard for him to ascertain what was in the car. (*Id.* at 104-05.) He did see a backpack and

8    tools on the passenger seat and a jumble of different objects. (*Id.* at 106.) He again ordered Mr.

9    Shah to keep his hands where he could see them. (*Id.* at 98-99.)

10        Officer Neula then communicated into his paddle microphone requesting expedited cover. (*Id.*

11    at 101.) Sergeants Puente, Divinagracia, and Farro each heard his request and separately

12    proceeded to his location. (Puente Dep. 25; Divinagracia Dep. 21; Farro Decl. ¶ 4.) Officer Neula

13    testified that, as he radioed HPD dispatch, he noticed Mr. Shah start to reach for the ignition area

14    and under the center column of the Honda with both hands. (Neula Dep. 101, 109.) He ordered

15    Mr. Shah to stop and to get his hands up. (*Id.* at 107-08.) He believed that Mr. Shah was trying to

16    start the car. (*Id.* at 109.)

17        Meanwhile, Mrs. Vancea heard Officer Neula order Mr. Shah out of the car, and saw that Mr.

18    Shah did not comply. (Vancea Dep. 26.) Mrs. Vancea also saw a woman, who proved to be the

19    second witness, Ms. Nelson, and children in the park. (*Id.*) Mrs. Vancea heard Officer Neula tell

20    Ms. Nelson to "take the kids with her and to go away, to leave." (*Id.*) While the officer interacted

21    with Ms. Nelson, Mrs. Vancea saw Mr. Shah make two attempts to leave. (*Id.* at 27.) Specifically,

22    she claims to have seen the wheels of the Honda move to the left and said, "he [Mr. Shah] tried to

23    back up his car because he tried not to run over the police officer." (*Id.* at 25, 63-64.) She believed

24    that the driver was trying to flee and was about to run over the officer. (*Id.* at 25-26.)

25        Officer Neula again ordered Mr. Shah to stop and put his hands up. (Neula Dep. 110-11.) Mr.

26    Shah did not comply. (*Id.* at 111.) Officer Neula then decided to kick out the Honda's window and

27    try to extract Mr. Shah from the car. (*Id.*) He kicked the window twice, breaking it on the second

28    attempt, and ordered Mr. Shah to get his hands up and to stop reaching for the ignition. (*Id.* at

United States District Court
Northern District of California

1   112.) According to Officer Neula, Mr. Shah continued to reach for the ignition area. (*Id.* at 113.)

2       Both Mrs. Vancea and Ms. Nelson saw Officer Neula break the car window. (Vancea Dep. 27;

3   Nelson Rec. at 6:15-6:30.) In describing what she saw Mr. Shah do, Ms. Nelson testified: "I seen

4   him lunge," "One hand went down," and "I just seen him move." (*Id.* at 8:00-8:15.) She now

5   grabbed the children and ducked behind the playground slide. She stated: "I didn't look at the

6   scene no more, I just covered my head." (*Id.* at 6:30-6:45.)

7       Meanwhile, Officer Neula holstered his gun, struck Mr. Shah in the side of the face (what the

8   defendants call a "palm-heel distraction strike"), and tried to pull him out of the Honda. (Neula

9   Dep. 113, 114.) (Officer Neula explained that he wanted to extract Mr. Shah from the car to

10  prevent him from accessing possible weapons. (*Id.* at 117.)) The impact (says Officer Neula)

11  caused Mr. Shah to flail up his left arm and lean right toward the passenger seat. (*Id.* at 114.)

12  Officer Neula says that he grabbed Mr. Shah around the waist area with his left arm and behind his

13  neck area with his right arm and began to pull him from the vehicle. (*Id.* at 121.) Mr. Shah resisted

14  and pulled away, causing Officer Neula to lose control of him. (*Id.* at 125.) From her home, Mrs.

15  Vancea saw Mr. Shah resist. (Vancea Dep. 65.) She stated in the audio recording that Mr. Shah

16  "pushed the officer because he was struggling. He did not want to get out." (*Id.*)

17      Officer Neula then started reaching for his Taser. (Neula Dep. 131-32.) He then heard Mr.

18  Shah say, "I got something for you" and reached down toward the driver's-side door. (*Id.*) Mrs.

19  Vancea stated that she saw Mr. Shah lean and bend, but she was not certain to which side. (Vancea

20  Dep. 66-67.) Officer Neula was still standing outside the Honda, within about one foot away,

21  when Mr. Shah said, "I got something for you." (Neula Dep. 133.) Officer Neula testified that this

22  concerned him because he's never heard a suspect say that to him. (*Id.* at 134-35.) Mr. Shah

23  repeated: "I got something for you." (*Id.* at 137.) Officer Neula says that he now saw Mr. Shah,

24  who was still sitting in the driver's seat, reach down into the left rear area of the car. (*Id.* at 135.)

25  Concerned for his safety, Officer Neula responded by telling Mr. Shah, "No, don't do it." (*Id.* at

26  136.)

27      From here, events escalated. As Mr. Shah's arms came back up into view, to about his own

28  chest level, Officer Neula claims that he saw something shiny. (*Id.* at 149.) Officer Neula stepped

United States District Court
Northern District of California

away from the Honda, reached for his firearm, and continued to yell, "No." (*Id.* at 138.) He thought at this point that Mr. Shah had a gun and was about to shoot him. (*Id.* at 37-38, 137-38.) Officer Neula fired his weapon in rapid succession as he retreated away from the Honda. (*Id.* at 153.) He believed that he fired two to three rounds. (*Id.* at 156.) Mrs. Vancea testified that she heard approximately three or four gunshots. (Vancea Dep. 32.) The whole interaction between Officer Neula and Mr. Shah lasted about two minutes. (*Id.* at 146.)

Officer Neula saw Mr. Shah lean back into the driver's seat, saw blood coming from his neck, and knew that he had been shot. (*Id.* at 161.) He radioed that shots were fired. (*Id.* at 161-62.) Sergeants Puente, Divinagracia, and Farro each heard Officer Neula radio that shots were fired. (Puente Dep. 28; Divinagracia Dep. 22; Farro Decl. ¶ 4.) After firing, Officer Neula did not approach the Honda due to his concern that a threat still existed: the car had not yet been "cleared for weapons" and backup officers had not yet arrived. (Neula Dep. 167-68.)

Sergeant Puente was the first backup officer to arrive. (*See id.* at 164; Puente Dep. 26, 31, 40.) When he did, he was concerned that he and Officer Neula were still in imminent danger. (*Id.* at 33-34.) Specifically, he was concerned that the two were positioned too close to the Honda without any cover, that they could not see beneath the door frame, and that the occupant could have a weapon. (*Id.*) Sergeant Puente realized he needed additional cover units to make the high-risk arrest. (*Id.* at 36-37.) Sergeant Puente and Officer Neula took a position of cover near the passenger's side of Officer Neula's patrol car. (*Id.* at 42-44.) From here, Sergeant Puente could see Mr. Shah opening and closing his eyes, and taking shallow breaths, and could see the gunshot wound to his neck; he then called for medical help. (*See id.* at 41-44.) He told HPD dispatch to have the Hayward Fire Department ("HFD") and emergency medical services ("EMS") proceed directly to the scene. (*Id.* at 46-47.) The defendants explain that this allowed the medical responders to proceed directly to the scene without having to "stage" away from the area. (*Id.*) Sergeant Puente believed the officers could secure the scene by the time the medical personnel arrived and did not want to delay medical attention to Mr. Shah. (*Id.*)

After Sergeants Farro and Divinagracia arrived, Sergeant Puente decided it was safe to make an arrest. (*Id.* at 51.) He directed Officer Neula, Sergeant Farro, and Sergeant Divinagracia to

remove Mr. Shah from the car. (*Id.* at 52.) Officer Neula and Sergeant Farro went to the driver's-side door. (Neula Dep. 172; Farro Decl. ¶ 7.) Sergant Farro reached through the window and touched the steering-wheel latch to help dislodge Mr. Shah from the driver's seat. (*Id.* ¶ 7.) Sergeant Divinagracia went to the passenger-side door to help. (Divinagracia Dep. 42.)

Sergeant Divinagracia and Officer Farro both testified that they observed that Mr. Shah had a knife. (Divinagracia Dep. 46; Farro Decl. ¶¶ 7-8.) Sergeant Divinagracia relates that he saw an open, wood-handled pocketknife with a two- or three-inch blade in Mr. Shah's right hand. (Divinagracia Dep. 46.) He also testified to seeing a shiny silver multi-tool in Mr. Shah's lap. (*Id.*) The pocketknife's blade was open and, according to Sergeant Divinagracia, the knife fell out of Mr. Shah's hand as he was pulled from the car. (*Id.* at 47.) Sergeant Farro recalls that as he began to pull Mr. Shah from the car, he saw a knife with a brown handle in Mr. Shah's right lap near his right hand. (Farro Decl. ¶¶ 7-8.) He also saw a silver-colored multi tool near Mr. Shah's right thigh. (*Id.*)

The officers removed Mr. Shah from the Honda and placed him on the ground. (Neula Dep. 176-77; Puente Dep. 57; Farro Decl. ¶ 9.) Sergeant Puente told the officers not to handcuff Mr. Shah so as not to interfere with medical care. (Puente Dep. 58; Farro Decl. ¶ 9.) Sergeant Farro estimates that HFD arrived approximately 15-20 seconds after the police had removed Mr. Shah from the car. (Farro Decl. ¶ 9.) HFD provided medical care to Mr. Shah before paramedics transported him to Eden Hospital. (Puente Decl. 60; Farro Decl. ¶ 10.)

\* \* \*

## II. THE PLAINTIFFS' VERSION

The plaintiffs find differences in the story. These stem mainly from Ms. Nelson's testimony. They note that — according to her deposition — she did not see Officer Neula stop behind his patrol-car door and give orders to Mr. Shah. (Nelson Dep. 17-18.) She testified instead that Officer Neula immediately walked to the Honda with his gun pointed at the car. (*Id.*) According to Ms. Nelson, Officer Neula told Mr. Shah to roll down the window and put his hands up — and Mr. Shah complied, raising both his hands. (*Id.* at 18, 33 ("I saw him complying with his order to keep his hands up, and then he got shot real fast.")) After Officer Neula broke the Honda's window,

Ms. Nelson says, Mr. Shah kept his hands up and a struggle ensued. (*Id.* at 19.) Mr. Shah's right hand dropped down, but not beneath his shoulder, while his left hand stayed in the air about shoulder high. (*Id.* at 21-22.) She did not see Mr. Shah bend down or back or reach for anything with his left arm. (*Id.* at 22, 47-48, 69.)

She then saw and heard Officer Neula shoot Mr. Shah. (*Id.* at 20.) Contrary to Officer Neula's description, Ms. Nelson testified that Mr. Shah did not reach for anything with his left hand immediately before Officer Neula shot him. (*Id.* at 23.) Nor did she hear the officer warn Mr. Shah that he might shoot. (*Id.* at 29.) According to Ms. Nelson, moreover, Officer Neula did not try to pull Mr. Shah from the car; the whole incident (from Officer Neula's arrival to the shooting) seemed to her to happen "very fast," "really fast." (*Id.* at 26-27.) She testified: "I don't know what [Officer Neula] needed a chance to do, but he didn't give [Mr. Shah] a chance, or whatever he was trying to do . . . ." (*Id.*) To her mind, "[H]e did it too fast. He shot him too soon." (*Id.* at 26.) (The plaintiffs' inferential gloss on this is that, according to Ms. Nelson's testimony, Officer Neula did not "take the time to determine a non-lethal course of action." (ECF No. 57 at 8.)) Officer Neula kept yelling at Mr. Shah to keep his hands up despite his being shot, slumped over, and, to Ms. Nelson's perception, "definitely dead." (Nelson Dep. 20, 29.) Sergeant Divinagracia thought Ms. Nelson was a "good witness" because she was present for the whole incident. (Divinagracia Dep. 68-70.)

The plaintiffs also discuss Mrs. Vancea's testimony. On the one hand, Mrs. Vancea agrees that Officer Neula tried to pull Mr. Shah from the car; like Ms. Nelson she denies that Mr. Shah reached for anything, but seemed instead to be resisting being pulled from the car; and she did not hear Mr. Shah say "I got something for you" or Officer Neula reply, "No, don't do it." (*Id.* at 30-31, 67.) On the other hand, Mrs. Vancea recounts facts that neither Officer Neula nor Ms. Nelson recalls: she alone claims that, as Officer Neula reached the Honda, Mr. Shah jumped from the passenger to the driver seat, rolled up the driver's-side window, and tried to drive away. (*See id.* at 22-25.)

*   *   *

### III. THE KNIFE

The plaintiffs make several points about the knife that was allegedly found on Mr. Shah. They first note that, according to Sergeant Puente (the first backup officer to arrive after the shooting), when he asked Officer Neula if he was okay, the latter responded, "I couldn't see his hands." (Puente Dep. 33, 48-49.) The plaintiffs' point being that Officer Neula could have been expected to, but in fact did not, mention a knife or even that he thought that Mr. Shah had reached for a weapon. (*See* ECF No. 57 at 9.) Furthermore, according to Sergeant Divinagracia, neither Sergeant Farro nor Officer Neula said that they saw any sort of weapon as they were trying to pull Mr. Shah from the car. (*See* Divinagracia Dep. 41-42.)

Sergeant Divinagracia testified that, in his experience, he would expect the primary officer to immediately warn backup officers about dangers present on the scene. (*Id.* at 34.) For example, he trains officers that if they are dealing with a subject and they see a gun, they should warn the other officers there is a gun on the scene. (*Id.*) Before he approached the Honda, none of the officers told him there was a weapon on the scene. (*Id.* at 43-44.) Sgt. Divinagracia also testified that when he got into the car, he saw a knife in Mr. Shah's right hand, down by his knee. (*Id.* at 48.) Sgt. He also claims to have seen a multi-tool with an exposed blade along with the wooden-handled knife on Mr. Shah's lap or in his hands. (*Id.* at 46-48.) He did not alert the other officers to the weapons or try to remove the knife from Mr. Shah's hand. (*Id.*) He did explain, however, that he did not mention the knife because the officers were "moving fast" trying to pull Mr. Shah from the car, and things "happened quick." (*Id.* at 47-48.)

In any event, no officer who was near or in direct contact with Mr. Shah, as they pulled him from the car, mentioned to their fellow officers that Mr. Shah had a knife in his hands. (*Id.* at 50:2-7.) None of these officers told Sergeant Puente that Mr. Shah was armed. (Puente Dep. 59.) Sergeant Puente relates that the first time any of the officers told him that there was a knife on the scene was after the paramedics had taken Mr. Shah away. (*Id.* at 72-74.) No one showed Sergeant Puente the knife. (*Id.* at 74.) There are no pictures in the record of either the car's interior from the day of the incident or any day or the knife or multi-tool.

Finally, the plaintiffs discuss facts concerning HPD policies in officer-involved shootings.

1    They first discuss facts related to preserving evidence. Sergeant Puente agreed that a shooting

2    officer should not be let back into the scene of a shooting; this raises concerns over the "sanctity of

3    the investigation" and invites allegations that the officer tampered with the evidence. (Puente Dep.

4    54.) There is no dispute here that Officer Neula re-entered and to some degree altered the incident

5    scene by getting into the Honda, moving the driver's seat and steering column, touching Mr. Shah,

6    and helping remove him from the car. (*See id.* at 57-58; Divinagracia Dep. 38-39, 41.)

7        The plaintiffs also point out that HPD did not interview Officer Neula after the shooting in

8    compliance with its policies. It is HPD policy to sequester the shooting officer in such a case.

9    (Puente Dep. 18-19.) One purpose of this is to maintain the integrity of the officer's recollection:

10   to prevent others from influencing his story or even his memory. (*See id.* at 18-20.) The HPD's

11   criminal-investigations bureau is supposed to interview a shooting officer within 24 hours of an

12   incident. (*Id.* at 22-24.) Officer Neula was not interviewed until three days after the shooting.

13                                              *   *   *

14   **IV. THE DEFENDANTS' REPLY**

15       The defendants' reply points out certain subtleties in the evidence. They first note

16   inconsistencies, or maybe just nuances, in Ms. Nelson's testimony. Ms. Nelson gave testimony

17   twice. On the day of the shooting, she was interviewed by the HPD; the defendants' initial motion

18   for summary judgment cites the audio recording of that interview. Eighteen months later, in March

19   2014, Ms. Nelson was deposed. Both parties variously cite her deposition testimony.

20       The defendants point to the following items in Ms. Nelson's testimony. At one point in her

21   deposition, as noted above, Ms. Nelson said that she did not see Officer Neula stand beside his

22   patrol car (in the area that the parties call the "V" between the car's door and frame). (Nelson Dep.

23   17-18.) (Officer Neula has said that, while standing in that area, he ordered Mr. Shah to put his

24   hands up. (Neula Dep. 82.)) Elsewhere in her deposition,  Ms. Nelson did describe seeing Officer

25   Neula stand beside his car after he arrived (albeit briefly), operate the radio on his shoulder, and

26   pull out his gun. (Nelson Dep. 37-39.) Furthermore, while Ms. Nelson did not hear Officer Neula

27   warn Mr. Shah that he might shoot (*id.* at 29), she did hear him repeatedly order Mr. Shah to put

28   his hands up (*id.* at 40-42). She testified that the "Hands up" order is the only one she heard

Officer Neula give while he stood beside his patrol car. (*Id.*) Last with respect to Ms. Nelson's testimony, the defendants write that, in her audio interview, she said that, after Officer Neula broke the car window, she ducked behind the playground slide with the children and no longer watched the encounter. (ECF No. 59 at 3 (citing Nelson Rec. 6:30-6:45)). "However, in her deposition," the defendants continue, "she claimed that she observed a 'struggle' but could not describe the struggle." (ECF No. 59 at 3 (citing Nelson Dep. 52-54).) The court is not convinced there is anything too discrepant here; reaching that determination would moreover entail a credibility determination that is improper at the summary-judgment stage. At all lengths, while in her interview Ms. Nelson indeed recounted ducking behind the slide after Officer Neula broke the Honda's window, she also said that she continued "peeking" at what was going on. (Nelson Rec. 8:19-8:32.) Similarly, in her deposition, she explains that while she was "walking towards the play structure" after the glass broke, she was "watching as [she was] walking." (Nelson Dep. 22.)

\* \* \*

### ANALYSIS

The court must grant a motion for summary judgment if the movant shows that there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). Material facts are those that may affect the outcome of the case. *Anderson*, 477 U.S. at 248. A dispute about a material fact is genuine if there is sufficient evidence for a reasonable jury to return a verdict for the non-moving party. *Id.* at 248-49.

The party moving for summary judgment bears the initial burden of informing the court of the basis for the motion, and identifying portions of the pleadings, depositions, answers to interrogatories, admissions, or affidavits which demonstrate the absence of a triable issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). It is important to remember that, "A moving party without the ultimate burden of persuasion at trial . . . has both the initial burden of production and the ultimate burden of persuasion on a motion for summary judgment." *Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1102 (9th Cir. 2000).

To meet its burden of production, "the moving party must either produce evidence negating an

United States District Court
Northern District of California

United States District Court
Northern District of California

essential element of the nonmoving party's claim or defense or show that the nonmoving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial." *Id.*; *see Devereaux v. Abbey*, 263 F.3d 1070, 1076 (9th Cir. 2001) ("When the nonmoving party has the burden of proof at trial, the moving party need only point out 'that there is an absence of evidence to support the nonmoving party's case.'") (quoting *Celotex*, 477 U.S. at 325).

If the moving party meets its initial burden, the burden shifts to the non-moving party to produce evidence supporting its claims or defenses. *Nissan Fire & Marine*, 210 F.3d at 1103. The non-moving party may not rest upon mere allegations or denials of the adverse party's evidence, but instead must produce admissible evidence that shows there is a genuine issue of material fact for trial. *See Devereaux*, 263 F.3d at 1076. If the non-moving party does not produce evidence to show a genuine issue of material fact, the moving party is entitled to summary judgment. *See Celotex*, 477 U.S. at 323.

In ruling on a motion for summary judgment, inferences drawn from the underlying facts are viewed in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

* * *

## I. EXCESSIVE FORCE – 42 U.S.C. § 1983 – FOURTH AMENDMENT

### A.  Excessive Force

Claims one and three assert Fourth Amendment violations based on Officer Neula's allegedly using excessive force that caused Mr. Shah's death.

Section 1983 provides a cause of action for the deprivation of "rights, privileges, or immunities secured by the Constitution or laws of the United States" by any person acting "under color of any statute, ordinance, regulation, custom, or usage." *Gomez v. Toledo*, 446 U.S. 635, 639 (1980). Section 1983 is not itself a source for substantive rights, but rather a method for vindicating federal rights conferred elsewhere. *See Graham v. Connor*, 490 U.S. 386, 393–394 (1989). To state a claim under § 1983, a plaintiff must allege: (1) the conduct complained of was committed by a person acting under color of state law; and (2) the conduct violated a right secured by the Constitution or laws of the United States. *See West v. Atkins*, 487 U.S. 42, 48 (1988).

It is undisputed that Officer Neula was acting under color of state law. The issue is whether the force he used was excessive in violation of the Fourth Amendment, which turns on whether the force was "objectively reasonable." *Arpin v. Santa Clara Valley Transp. Agency*, 261 F.3d 912, 921 (9th Cir. 2001) (citing *Graham*, 490 U.S. at 388).

"Determining whether the force used to effect a particular seizure is reasonable under the Fourth Amendment requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Graham*, 490 U.S. at 396 (internal citations and quotations omitted). To do so, a court must evaluate "the facts and circumstances of each particular case, including [(1)] the severity of the crime at issue, [(2)] whether the suspect poses an immediate threat to the safety of the officers or others, and [(3)] whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham*, 490 U.S. at 396 (citing *Tennessee v. Garner*, 471 U.S. 1, 8-9 (1985)). The most important of these three factors is whether the suspect poses an immediate threat to the safety of the officers or others. *Id*. The *Graham* factors, however, are not exhaustive. *George v. Morris*, 736 F.3d 829, 837-38 (9th Cir 2013). Because "there are no per se rules in the Fourth Amendment excessive force context," *Mattos v. Agarano*, 661 F.3d 433, 441 (9th Cir. 2011) (en banc), courts must "examine the totality of the circumstances and consider 'whatever specific factors may be appropriate in a particular case, whether or not listed in *Graham*.'" *Bryan v. McPherson*, 630 F.3d 805, 826 (9th Cir. 2010) (quoting *Franklin v. Foxworth*, 31 F.3d 873, 876 (9th Cir. 1994)). "Other relevant factors include the availability of less intrusive alternatives to the force employed, whether proper warnings were given[,] and whether it should have been apparent to officers that the person they used force against was emotionally disturbed." *Glenn v. Washington County*, 673 F.3d 864, 872 (9th Cir. 2011) (citations omitted).

"The reasonableness of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396 (1989) (citing *Terry v. Ohio*, 392 U.S. 1, 20-22 (1968)); *see id*. at 396-97 ("'Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers,' . . . violates the Fourth Amendment.") (quoting *Johnson v. Glick*, 481 F.2d 1028, 1033 (2d Cir. 1973)). This is

because "[t]he calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments — in circumstances that are tense, uncertain, and rapidly evolving — about the amount of force that is necessary in a particular situation." *Id.*

It is also important to remember that the court's review of the evidence is influenced by the fact that the other principal witness to these events — Mr. Shah — is dead.  Of such cases the Ninth Circuit has said: "We are mindful that cases in which the victim of alleged excessive force has died 'pose a particularly difficult problem' in assessing whether the police acted reasonably, because 'the witness most likely to contradict [the officers'] story . . . is unable to testify.'" *Gregory v. County of Maui*, 523 F.3d 1103, 1107 (9th Cir. 2008) (quoting in part *Scott v. Henrich*, 39 F.3d 912, 915 (9th Cir.1994)). "Accordingly, [the court] must 'carefully examine all the evidence in the record' to determine if the officers' account of the events is credible." *Gregory*, 523 F.3d at 1107 (quoting in part *Scott v. Henrich*, 39 F.3d at 915). "Following such reasoning," the Ninth Circuit has "denied summary judgment to defendant police officers in cases where 'a jury might find the officers' testimony that they were restrained in their use of force not credible, and draw the inference from the medical and other circumstantial evidence that the plaintiff's injuries were inflicted on him by the officers' use of excessive force.'" *Gregory*, 523 F.3d at 1107 (quoting in part *Santos v. Gates,* 287 F.3d 846, 852 (9th Cir. 2002)).

The evidence here does not allow the court to conclude, as a matter of law, that Mr. Shah possessed a knife or acted in a way that posed  "an immediate threat" to Officer Neula's safety. (The knife is important: it would corroborate Officer Neula's account that he shot based on Mr. Shah's saying "I got something for you" and Mr. Shah's simultaneous reaching into the left rear area of the car.)  The defendants argue: "There are no evidentiary facts that contradict Sergeant Divinagracia['s] or Sergeant Farro's observations regarding the knife on [Mr. Shah's] person." (ECF No. 59 at 4.) That is accurate. The court's assessment of that fact must be tempered, however, by *Gregory's* direction to "carefully examine all the evidence in the record" in such a situation to decide if a jury could find the officers' testimony other than credible, and infer that Officer Neula used excessive force. The court earlier discussed facts that prevent the court from concluding, as a matter of law, that Mr. Shah had a knife or, assuming that he had one, that he

United States District Court
Northern District of California

threatened Officer Neula with it. It is striking, for example, that no officer mentioned a knife until medical personnel had already removed Mr. Shah from the scene. The backup officers' own testimony shows that, in cases where a suspect has a weapon, it is normal for officers to alert one another to that fact. (A point that might need only common sense to establish for Rule 56 purposes.) Because Mr. Shah is dead, the testimony of Officer Divinagracia and Sergeant Farro on this point — even if offered in the best of faith — cannot be treated as dispositive. The jury must hear and weigh the testimony.

This is especially true because eyewitness Grace Nelson's account of what happens differs markedly from Officer Neula's. She recounts that Mr. Shah kept his hands up the entire time in response to Officer Neula's orders to do so, and that while his right hand dropped down after Officer Neula smashed the window (a logical physical reaction if one considers the scenario), it never dropped below his shoulder. She also testified that Mr. Shah did not bend down or reach in back, which again contradicts Officer Neula's account.

These are important and perhaps dispositive differences, particularly given that the undisputed evidence is that Officer Neula did not warn Mr. Shah that he might use deadly force. Or at least, the defendants have not pointed the court to any testimony indicating that Officer Neula did issue such a warning. And Ms. Nelson affirmatively testified that she heard Officer Neula repeatedly order Mr. Shah to keep his hands up — but that this was the only thing that he told Mr. Shah; she did not hear him warn Mr. Shah that he might shoot. (Nelson Dep. 29, 40-42.) This too makes it impossible for the court to grant the defendants summary judgment. *See Glenn*, 673 F.3d at 876 (reversing grant of summary judgment partly because it was not clear whether decedent heard or understood officers' warnings and decedent may have been confused about whether his life was in immediate danger) (citing *Deorle v. Rutherford*, 272 F.3d 1272, 1284 (9th Cir. 2001) (instructing that "warnings should be given, when feasible, if the use of force may result in serious injury, and that the giving of a warning of the failure to do so is a factor to be considered in applying the *Graham* balancing test")).

To the extent that the defendants point to Ms. Vancea's testimony, it does not alter the outcome. There are some things she corroborates, but there are other details that she advances

(trying to flee, hopping from the passenger seat to the driver's seat) that no one else recounts. These are perhaps classic issues regarding eyewitness evidence, and they are why the trier of fact must weigh and credit the evidence.

A final issue is the knife. Even if Mr. Shah did have a knife, the "fact that a 'suspect is armed with a deadly weapon' does *not* render an officer's shooting of the suspect *per se* reasonable under the Fourth Amendment . . . ." *George*, 736 F.3d at 832-33, 838-39 (emphasis in original). The Ninth Circuit has explained in this vein:

> In *Glenn v. Washington County*, we found that in a 911 scenario without flight or an alleged crime, the officers' decision to shoot an individual holding a pocket knife, "which he did not brandish at anyone," violated the Constitution. 673 F.3d 864, 873–78 (9th Cir.2011). Reviewing *Long* and *Scott,* we explained that the fact that the "suspect was armed with a deadly weapon" does *not* render the officers' response per se reasonable under the Fourth Amendment. *Id.* at 872–73; *see also Harris v. Roderick*, 126 F.3d 1189, 1204 (9th Cir.1997) ("Law enforcement officials may not kill suspects who do not pose an immediate threat to their safety or to the safety of others simply because they are armed.").

*George*, 736 F.3d at 838; *see Glenn*, 673 F.3d at 867-69, 872-78 (a suspect's possessing a knife is important but not itself dispositive; finding that a jury could find that the officers' decision to shoot an individual holding a pocketknife, which the individual did not brandish at anyone, violated the Constitution); *Harris v. Roderick*, 126 F.3d 1189, 1204 (9th Cir. 1997) ("Law enforcement officials may not kill suspects who do not pose an immediate threat to their safety or to the safety of others simply because they are armed."); *Curnow v. Ridgecrest Police*, 952 F.2d 321, 323, 325 (9th Cir. 1991) (holding that deadly force was unreasonable where, according to the plaintiff's version of facts, the decedent possessed a gun but was not pointing it at the officers and was not facing the officers when they shot him).

Here, there was an "alleged crime": the Honda had been reported stolen. It is undisputed that Mr. Shah was sitting in the car when Officer Neula approached the Honda, and that he remained inside the car until he was shot. Other than that, the facts are disputed as to, even with a knife, Mr. Shah posed an "immediate threat" to Officer Neula so that shooting him, and shooting him multiple times, was objectively reasonable under the Fourth Amendment. These disputed issues, taken individually and certainly when taken together, compel the court to deny the defendants'

1    motion for summary judgment. The Ninth Circuit's decision in *Glenn* expresses the gist of this

2    court's conclusion on the excessive-force claims:

3            Balancing these various considerations, we hold that the district
         court erred in granting summary judgment on the constitutionality of
4            the officers' use of force. We recognize that the officers have
         offered evidence that could support a verdict in their favor. A jury
5            could view the facts as the district court did, and likewise reach the
         conclusion that the officers' use of force was reasonable. But on
6            summary judgment, the district court is not permitted to act as a
         factfinder. The circumstances of this case can be viewed in various
7            ways, and a jury should have the opportunity to assess the
         reasonableness of the force used after hearing all the evidence.
8            Because the disputed facts and inferences could support a verdict for
         either party, we are compelled to reverse the district court's entry of
9            summary judgment.

10   *Glenn*, 673 F.3d at 878 (internal citation omitted); *see also Burns*, 737 F. Supp. 2d at 1058-59

11   ("Because an excessive force claim 'nearly always requires a jury to sift through disputed factual

12   contentions, and to draw inferences therefrom,' the Ninth Circuit has also instructed that summary

13   judgment in excessive force cases should be granted sparingly.") (citing *Santos*, 287 F.3d at 853).

14                                        *   *   *

15   **B.  Qualified Immunity**

16       The defendants also contend that they are entitled to qualified immunity from the plaintiffs'

17   suit. "The doctrine of qualified immunity protects government officials 'from liability for civil

18   damages insofar as their conduct does not violate clearly established statutory or constitutional

19   rights of which a reasonable person would have known.'" *Pearson v. Callahan*, 555 U.S. 223, 231

20   (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). "Qualified immunity balances

21   two important interests — the need to hold public officials accountable when they exercise power

22   irresponsibly and the need to shield officials from harassment, distraction, and liability when they

23   perform their duties reasonably." *Id.* "The protection of qualified immunity applies regardless of

24   whether the government official's error is 'a mistake of law, a mistake of fact, or a mistake based

25   on mixed questions of law and fact.'" *Id.* (quoting *Groh v. Ramirez*, 540 U.S. 551, 567 (2004)

26   (Kennedy, J., dissenting)).

27       In *Saucier v. Katz*, 533 U.S. 194 (2001), the Supreme Court "mandated a two-step sequence

28   for resolving government officials' qualified immunity claims." *Id.* at 232. "First, a court must

United States District Court
Northern District of California

decide whether the facts that a plaintiff has alleged (see Fed. Rules Civ. Proc. 12(b)(6), (c)) or shown (see Rules 50, 56) make out a violation of a constitutional right." *Id.* (citing *Saucier*, 533 U.S. at 201). This part of the inquiry "mirrors the substantive summary judgment decision on the merits." *Sorrels v. McKee*, 290 F.3d 965, 969 (9th Cir. 2002). "If no constitutional right would have been violated were the allegations established," then the officer is entitled to qualified immunity. *Saucier*, 533 U.S. at 201. "Second, if the plaintiff has satisfied this first step, the court must decide whether the right at issue was 'clearly established' at the time of defendant's alleged misconduct." *Pearson*, 555 U.S. 232. "Qualified immunity is applicable unless the official's conduct violated a clearly established constitutional right." *Id.* (citing *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)).

The plaintiffs here have raised a triable case that — or, put differently, the parties' evidence presents genuine issues of material fact as to whether — Officer Neula used excessive force and so violated Mr. Shah's Fourth Amendment rights. The plaintiffs have therefore satisfied *Saucier's* first step.

As to *Saucier's* second step, "the relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier*, 533 U.S. at 202; *see also Walker v. Gomez*, 370 F.3d 969, 978 (9th Cir. 2004). This inquiry "must be undertaken in light of the specific context of the case, not as a broad general proposition." *Saucier*, 533 U.S. at 201. "This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in the light of pre-existing law the unlawfulness must be apparent." *Anderson*, 483 U.S. at 640.

Officer Neula shot Mr. Shah in 2012. By that time, "[c]ase law ha[d] clearly established that an officer may not use deadly force to apprehend a suspect where the suspect poses no immediate threat to the officer or others." *Wilkinson v. Torres*, 610 F.3d 546, 550 (9th Cir. 2010); *see Curnow*, 952 F.2d at 325 (affirming denial of qualified immunity where, under plaintiff's version of the 1986 shooting, the officers could not reasonably have believed that deadly force was lawful where decedent did not point the gun at the officers and apparently was not facing them when they

1    shot him the first time).

2        Officer Neula may be entitled to qualified immunity after the disputed material facts are

3    resolved. But, for now, the court denies the defendants' motion insofar as it asks the court

4    conclude as a matter of law that Officer Neula is immune. The Ninth Circuit has said: "Where the

5    officers' entitlement to qualified immunity depends on the resolution of disputed issues of fact in

6    their favor, and against the non-moving party, summary judgment is not appropriate." *Wilkins v.*

7    *City of Oakland*, 350 F.3d 949, 956 (9th Cir. 2003); *accord Santos*, 287 F.3d at 855 n.12 (finding

8    it premature to summarily decide qualified-immunity issue "because whether the officers may be

9    said to have made a 'reasonable mistake' of fact or law may depend on the jury's resolution of

10   disputed facts and the inferences it draws therefrom") (internal citation omitted); *see also*

11   *McCloskey v. Courtnier*, No. C 05-4641 MMC, 2012 WL 646219, at *3 (N.D. Cal. Feb. 28, 2012);

12   *Burns*, 2010 WL 3340552, at *12 ("Just as the question of whether a constitutional violation

13   occurred here turns entirely on whose facts to accept, so too does the question of immunity. More

14   simply, if [plaintiff] behaved as the officers contend, their mistake of fact might be objectively

15   reasonable. If he did not, the mistake may be deemed unreasonable."); *Herrera v. Las Vegas*

16   *Metro. Police Dept.*, 298 F. Supp. 2d 1043, 1051 (D. Nev. 2004) ("[I]t would be premature to

17   determine the officials' qualified immunity status at this time [after having concluded that a

18   reasonable jury could find that the action complained of constituted a violation of the decedent's

19   Constitutional rights], because whether the officers may be said to have acted reasonably will

20   depend on the jury's resolution of the disputed facts.") (citation omitted).

21                                    *   *   *

22   **II. SUBSTANTIVE DUE PROCESS – FOURTEENTH AMENDMENT – LOSS OF**

23        **FAMILIAL RELATIONSHIP**

24        The plaintiffs' second claim alleges that, by using excessive force in shooting and killing Mr.

25   Shah, Officer Neula deprived them of their Fourteenth Amendment substantive-due-process

26   interest in a familial relationship. (ECF No. 40 at 8, ¶¶ 29-30.) Here, too, the disputed material

27   facts discussed above, in the context of the Fourth Amendment claim, prevent the court from

28   granting the defendants' motion for summary judgment.

United States District Court
Northern District of California

1   The Fourteenth Amendment's substantive-due-process clause protects against the arbitrary or

2   oppressive exercise of government power. *See County of Sacramento v. Lewis*, 523 U.S. 833, 845-

3   46 (1998). Parents and children may assert Fourteenth Amendment substantive-due-process claims

4   if they are deprived of their liberty interest in the companionship and society of their child or

5   parent through official conduct. *See Lemire v. Cal. Dept. of Corrections & Rehabilitation*, 726

6   F.3d 1062,1075 (9th Cir. 2013) (parents and children); *Smith v. City of Fontana*, 818 F.2d at 1418-

7   19; *Curnow v. Ridgecrest Police*, 952 F.2d 321, 325 (9th Cir. 1991) (parent); *Crumpton v. Gates*,

8   947 F.2d 1418, 1421-24 (9th Cir. 1991) (child). "[T]he Due Process Clause is violated by

9   executive action only when it can be properly characterized as arbitrary, or conscience shocking,

10  in a constitutional sense." *Lewis*, 523 U.S. at 845-47; *see Lemire*, 726 F.3d at 1075. The

11  cognizable level of executive abuse of power is that which "shocks the conscience" or "violates

12  the decencies of civilized conduct." *Lewis*, 523 U.S. at 846. Mere negligence or liability grounded

13  in tort does not meet the standard for a substantive-due-process decision. *Id.* at 849.

14      The parties agreed at the April 16, 2015 hearing that this claim is governed by the "shocks the

15  conscience" standard. This standard harbors a dichotomy that can itself impede summary

16  judgment. The Ninth Circuit has explained: "In determining whether excessive force shocks the

17  conscience, the court must first ask 'whether the circumstances are such that actual deliberation

18  [by the officer] is practical.'" *Porter v. Osborn*, 546 F.3d 1131, 1137 (9th Cir. 2008) (quoting

19  *Moreland v. Las Vegas Metro. Police Dep't*, 159 F.3d 365, 372 (9th Cir. 1998) (internal quotation

20  marks omitted)). "Where actual deliberation is practical, then an officer's 'deliberate indifference'

21  may suffice to shock the conscience. On the other hand, where a law enforcement officer makes a

22  snap judgment because of an escalating situation, his conduct may be found to shock the

23  conscience only if he acts with a purpose to harm unrelated to legitimate law enforcement

24  objectives." *Hayes v. County of San Diego*, 736 F.3d 1223, 1230 (9th Cir. 2013) (citing *Wilkinson*,

25  610 F.3d at 554).

26      A court may determine at summary judgment whether the officer had time to deliberate (such

27  that the "deliberate indifference" standard applies) or instead had to make a snap judgment

28  because he found himself in a quickly escalating situation (such that the "purpose to harm"

United States District Court
Northern District of California

1    standard applies), "so long as the undisputed facts point to one standard or the other." *Duenez v.*

2    *City of Manteca*, No. CIV. S-11-1820 LKK/KJN, 2013 WL 6816375, at *14 (E.D. Cal. Dec. 23,

3    2013). "By its nature," though, "the determination of which situation [the officer] actually found

4    himself in is a question of fact for the jury, so long as there is sufficient evidence to support both

5    standards." *Id.*

6        A reasonable juror could find that the evidence here supports both standards. Which is to say,

7    the court cannot decide the issue as a matter of law. Consider again Ms. Nelson's testimony.

8    According to her, Officer Neula proceeded almost immediately from his car, gun out, and all too

9    quickly shot Mr. Shah multiple times. "Too soon," "too fast," as she describes things. (Nelson

10   Dep. 26-27, 33.) If a jury believed this description, then it could find that Officer Neula himself

11   "escalated the situation" unnecessarily, or deprived himself of "time to deliberate," and, as

12   plaintiffs' counsel has argued, generally acted in a way that reasonable people could consider

13   conscience-shocking. The defendants point to arguable discrepancies in Ms. Nelson's testimony.

14   This includes her (again, arguably) different recollections of whether she saw Officer Neula stand

15   next to his patrol car for some time after arriving, or whether he proceeded immediately toward

16   the Honda, weapon drawn. But this is a textbook case of questioning witness credibility, or how

17   much weight to accord a witness's testimony, and that is not something the court can indulge in

18   under Rule 56. A jury may find Ms. Nelson's description believable and could on that basis deem

19   Mr. Shah's demise conscience-shocking.

20                                                                  *   *   *

21   **III. – WRONGFUL DEATH BY NEGLIGENCE – CAL. CIV. PRO. §§ 377.60–.61**

22       The plaintiffs' fifth claim — which only plaintiff C.E.W. brings — is for wrongful death under

23   Cal. Civ. Proc. Code § 377.60, "which is simply the statutorily created right of an heir to recover

24   for damages resulting from a tortious act which results in the decedent's death," *Gilmore v.*

25   *Superior Court*, 230 Cal. App. 3d 416, 420 (Cal. Ct. App. 1991) (citations omitted). "The elements

26   of the cause of action for wrongful death are the tort (negligence or other wrongful act), the

27   resulting death, and the damages, consisting of the pecuniary loss suffered by the heirs." *Quiroz v.*

28   *Seventh Ave. Center*, 140 Cal. App. 4th 1256, 1264 (Cal. Ct. App. 2006). The California Supreme

United States District Court
Northern District of California

Court has held that "an officer's lack of due care can give rise to negligence liability for the intentional shooting death of a suspect." *Munoz v. Olin*, 24 Cal. 3d 629, 634 (1979) (citing *Grudt v. City of Los Angeles*, 2 Cal. 3d 575, 587 (1970)). In this context, to prove the tort, a plaintiff must show that the officer violated his "duty to use reasonable force under the totality of the circumstances." *See Brown v. Ransweiler*, 171 Cal. App. 4th 516, 526 n.10 (Cal. Ct. App. 2009). Moreover, where the officer's preshooting conduct did not cause the plaintiff any injury independent of the injury resulting from the shooting, the officer's preshooting conduct is properly "included in the totality of circumstances surrounding [his] use of deadly force." *Hayes v. County of San Diego*, 57 Cal. 4th 622, 632 (2013).

As explained above, genuine issues of material fact prevent the court from ruling as a matter of law that Officer Neula's conduct did not violate the Fourth Amendment — that he "use[d] reasonable force under the totality of the circumstances." This also means that the court cannot summarily rule that Officer Neula cannot be liable for wrongful death under section 377.60.

* * *

## IV. BANE ACT – CAL. CIV. CODE § 52.1

The plaintiffs' sixth and last claim is under California's Bane Act (Cal. Civ. Code. § 52.1). (ECF No. 40 at 11, ¶¶ 46-47.) The Bane Act prohibits interference or attempted interference with a person's rights under federal or California law by "threats, intimidation, or coercion." Cal. Civ. Code § 52.1(a).

Federal district courts applying the Bane Act have reached different conclusions about the conduct necessary to support a claim. One line of cases has held that the coercive conduct must be separate from the alleged constitutional violation. *See Rodriguez v. City of Fresno*, 819 F. Supp. 2d 937, 953 (E.D. Cal. 2011) (holding that "in order to maintain a claim under the Bane Act, the coercive force applied against a plaintiff must result in an interference with a separate constitutional or statutory right. It is not sufficient that the right interfered with is the right to be free of the force or threat of force that was applied."). Other courts have concluded that a Bane Act claim may be based on the same coercive conduct as a constitutional claim. *See Bass v. City of Fremont,* No. C12-4943 TEH, 2013 WL 891090, at *5-6 (N.D. Cal. Mar. 8, 2013) (holding that

United States District Court
Northern District of California

the Bane Act applies where the underlying statutory or constitutional violation involved threats, intimidation, or coercion, without a separate showing of coercion). In the absence of binding authority, the court finds persuasive the line of cases permitting Bane Act claims based on the same conduct as an underlying constitutional violation. As discussed in *Bass*, this reading comports with the legislative history and the relatively broad statutory interpretation advanced in *Venegas v. County of Los Angeles*, 32 Cal. 4th 820, 823, 842 (2004). *See Bass*, 2013 WL 891090, at *5.

The defendants cite the Bane Act test set out in *Shoyoye v. County of Los Angeles*, 203 Cal. App. 4th 947, 959 (2012). (*See* ECF No. 53 at 29-30.) In *Shoyoye*, the court held that § 52.1 requires "a showing of coercion independent from the coercion inherent in the wrongful detention itself." 203 Cal. App. 4th at 959. *Shoyoye* is distinguishable on its facts. There, the plaintiff was lawfully arrested but detained for much longer than permitted by law because of a negligent (and inadvertent) computer error. *Id.* at 951-53. In contrast, the constitutional violations alleged here were deliberate and "interfere[d] with the exercise or enjoyment of a constitutional right." *See id.* at 957-58; *see also Bass* 2013 WL 891090, at *6 ("*Shoyoye* is best viewed as a carve-out from the general rule stated in *Venegas*").

The defendants cast their Bane Act analysis in the same terms as their underlying constitutional claims alleging excessive force. That is to say, they move for summary judgment on the ground that, "Under the totality of the circumstances, Officer Neula's actions were reasonable . . . ." (ECF Nos 53 at 30, 59 at 9.) The plaintiffs respond that, "[s]hooting an unarmed compliant person is 'deliberate and spiteful' and is a violation of the Bane Act." (ECF No. 57 at 20.)

The court has already found that, in assessing the record evidence, a reasonable jury could conclude both that Mr. Shah was unarmed and that, contrary to Officer Neula's testimony, he in fact complied with the officer's orders. For the same reasons that the court cannot conclude, as a matter of law, that Officer Neula did not violate Mr. Shah's rights under the Fourth and Fourteenth Amendments, neither can it grant the defendants summary judgment on the plaintiffs' Bane Act claim.

1

## CONCLUSION

2      The court denies the defendants' motion for summary judgment. This disposes of ECF No. 53.

3      **IT IS SO ORDERED.**

4   Dated: April 27, 2015

5   _____
    LAUREL BEELER
6   United States Magistrate Judge

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28